All right, we're going to go on to the third case of the day, and that is 142222, and it's Duncan v. United States Railroad Retirement Board. And good morning, Ms. Marcus. How are you? Good morning. Fine, thank you. How are you? May it please the Court, Meredith Marcus on behalf of Petitioner Adrienne Duncan. This is an appeal due to an application for total and permanent disability annuity under the Railroad Retirement Act. We presented two arguments. The first was the weight assigned to treater, pain management specialist, Dr. Farrell, and consultative examiner, Dr. Gupta's opinions, and the second was the credibility assessment. With respect to Dr. Farrell's opinion, we have a span of nearly seven years of treatment. Mr. Duncan first proceeded with conservative care, dating back through 2004. He then goes on, undergoes surgery, there's a period of perhaps some remission, and then eventually that diagnosis is failed back syndrome. Now were there medications or treatments to which Mr. Duncan would have had access if he had paid the additional $200 per month to obtain coverage on his wife's insurance? You know, that's not clear on the record. The hearing officer certainly didn't develop it at the hearing. But the only treatment that was recommended by Dr. Farrell at one point was physical therapy. The later records from Dr. Farrell make no reference to the physical therapy and recommendation to proceed with it. Dr. Farrell's records also reference that Mr. Duncan had tried injection therapy in the past and had failed it. Is that why he declined treatment with injections? That is correct. That's both in his hearing transcript and in the recommendations and notations by Dr. Farrell. Was it the exact course of treatment or was it a different injection with which he had a bad experience? It was injections prior to his surgery, so it was a different period of injections back in 2006. Did any of his treating physicians speculate about why his pain became less manageable after that initial improvement following his surgery for the spinal infusion? I think you could read into Dr. Farrell's notations the fact that by diagnosing failed back syndrome, it's inherent that the pain became severe enough after the fact that that initial 2006 surgery just simply didn't work. Other than that, we really don't have anything in the record as to why the initial surgery didn't work. We have that secondary opinion from Dr. Foley who, like Dr. Farrell and Dr. Gupta, do make reference to the reduction in the range of motion, the 50% range of motion loss, which is conspicuously absent from Dr. Oye's assessment. There's really nothing there in terms of Dr. Oye's assessment as to why Mr. Duncan's capable of light work and the hearing officer and the board gave it such significant weight. Did he ever see an orthopedic specialist? No, I don't believe he did, but specifically there's nothing in Duncan's record stating that he should be sent on to an orthopedic specialist. There's nothing absent that one reference to physical therapy that states that Duncan should proceed with physical therapy. There's nothing with respect to injection therapy after that initial note that he should proceed with injection therapy. Dr. Farrell states that he's complied with her treatment and only prescribes medication therapy. There is the possibility that he was only prescribed that therapy and complying with that therapy because he didn't have insurance, but that, again, is just something that's not referenced, not spoken to in the record. But with respect to Dr. Oye's assessment that's given such significant weight, Dr. Oye states that Dr. Farrell's opinion is not complete, that June 2010 reference to not complete. The Regulation 20 CFR 22.112C states that if the opinion's not to be afforded full or controlling weight, then the hearing officer should make every reasonable effort to recontact the medical treating physician and try and clarify that medical opinion. It's clear in this case that I think that regulation should have been triggered and nothing was done there, and perhaps that July 2011 letter might have clarified the completeness that Dr. Oye was perhaps referencing. Dr. Oye doesn't make any assertion that Dr. Farrell's assessment isn't consistent with the record, just that it's not complete. With respect to the credibility assessment, the hearing officer suggests that Duncan hadn't tried everything, talked about how there wasn't notation in the record that Farrell recommended he pursue orthopedic care or physical therapy absent that one reference. There's also, out of every doctor of record, the treating, examining, and reviewing doctor is not one made reference to the fact that Duncan should pursue the use of a cane or a back brace, but the hearing officer essentially seems to be playing doctor and asserting that had he utilized a cane or a back brace, that might have alleviated some of the pain here. It's a chronic pain case, it's not an issue of imbalance that Mr. Duncan was asserting at the hearing. There's also some reference made to the sit and squirm test. Even if the hearing officer was correct to make reference to the fact that Duncan didn't appear to be uncomfortable while sitting at the hearing, it's clear from the record that Duncan was sitting and standing throughout the hearing. This is seemingly consistent with Duncan's testimony at the hearing that he was unable to sit or stand for more than 10 minutes at a time. It seems to be consistent with Dr. Farrell's assessment that Duncan not sit or stand for periods greater than 30 minutes at a time, and it certainly, I think, would run contradictory to the hearing officer and to Dr. Oye's assessment of full light work, which would inherently require being on one's feet for six hours out of an eight-hour work day. Specifically, with respect to the treating physician opinion, I think that the respondent points to Dray versus Railroad Board, and I think that case is on point for the fact that the judgment favoring the medical assessment of A through L and discrediting M through Z without further elucidation should not be based on substantial evidence. I think that the evidence here certainly supports the finding of giving Dr. Farrell's multiple opinions and opinions post-Dr. Oye's assessment substantial and full weight, and I'll reserve any further time I have for rebuttal. Thank you. Thank you. Good morning, Ms. Neuendorf. Good morning. Good morning. May it please the Court, my name is Michelle Neuendorf, Counsel for the U.S. Railroad Retirement Board. I want to ask you something. What are Dr. Oye's qualifications? Specifically, in what area of medicine is she board certified? Unfortunately, I don't have that in front of me. That's not part of the record. She is one of the consulting physicians that the board uses, the board routinely in disability cases like this send medical records for evaluation by a consulting physician who looks at all of the medical evidence that's submitted by different doctors, and she was one of those doctors. So, because Dr. Oye noted that Dr. Farrell's residual function capacity assessment in June of 2010 was incomplete, and at that point the board bears the burden of contacting Dr. Farrell to get more information, does it not? Well, first of all, the regulation that's being referred to is permissive, but more And so the board is supposed to go back for more information from the treating physician if the opinion is incomplete. The RFC determination is up to the board. Only the board can make determinations regarding whether an individual is disabled, and only the board makes determinations regarding the RFC. So, even though the RFC was incomplete in that assessment, the board still had sufficient medical evidence from Dr. Farrell regarding Mr. Duncan's ability to do work. So, the board doesn't bear the burden of contacting Dr. Farrell. Not regarding an RFC, because the RFC is actually a legal conclusion that's made by the board. And the hearing officer noted that Duncan should have paid that $200 so that he would take on the additional expense to get the needed treatment. What was the supposedly needed treatment that would have improved his condition? There's nothing in the record explaining what that would be. That section of the opinion, there are a couple of lines in the opinion in response to Mr. Duncan's testimony that he tried absolutely everything to get relief from this back pain. She then pointed to some things that he didn't do in order to relieve the back pain. So, that was more of a credibility determination as opposed to substituting her opinion regarding medical evidence. And quite frankly, even if we concede that she shouldn't have made that comment, that isn't really relevant to the issue at hand, there's still substantial evidence in the record to support her finding. It wasn't in her findings. It was a passing comment in an 18-page decision. She thoroughly went through all the medical evidence that was included. She went over the testimony. She went over the vocational experts' testimony. So, that one comment doesn't rise to the level of reversible error. And one more question. Sure. Did the hearings officer ever acknowledge Dr. Pearl's observation that the lack of obvious pathology on the MRI and CT imaging did not rule out the possibility that an atherosclerosis was, in fact, occurring? She specifically addressed that. She went through all of Dr. Farrell's notes. And she presented the notes related to that exam to the vocational expert. And the vocational expert still said, even considering Dr. Farrell's limitations, that he still had the capacity for sedentary work. So, she did address that evaluation. Does that answer your question? Well, because what I wondered was whether the hearings officer made any attempt to understand what Dr. Farrell meant by inflammatory process. Well, first of all, that one statement about the inflammatory process is a double negative. It's equivocal. It says that he could be having this inflammatory process. It doesn't state that he is. She admits in her letter that the MRI findings are normal and there's no objective medical findings to support that finding. It's just a possibility. In addition, the hearings office did consider Dr. Farrell's opinions. And like I said, the June 2010 medical assessment and the July 2010 letter that Dr. Farrell submitted, she presented both of those hypotheticals to the vocational expert. And the vocational expert still found that Mr. Duncan had the capacity for sedentary work and for his previous work as a limousine driver, as it is done in the national economy. What Mr. Duncan is asking us to do is to solely rely on the opinions that Dr. Farrell submitted later, which were in November 2010 and, I believe, April 2011, where she fills in these one-page checkmarked forms, which I'm not sure where they came from, which are very conclusory and aren't supported by her actual medical findings. Mr. Duncan had visits with Dr. Farrell around the same time, contemporaneously with these opinions, and the actual observations in the office were that his musculoskeletal exams were normal. So the hearings officer had to resolve that discrepancy between these conclusions and the actual exam findings. It should be noted that the decision of the Railroad Retirement Board is not to be set aside if it is supported by substantial evidence in the record and is not based in an error of law. The evidence in this case establishes that Mr. Duncan's impairments do not prevent him from performing any regular employment in the national economy. So even though he did have limited range of motion, and even though he did have some pain that the hearings officer recognized, that doesn't mean that he was unable to perform any work in the national economy. She restricted him to light and sedentary work. Again, the claimant for a disability annuity is responsible for providing evidence of the claimed disability, and must provide medical evidence showing that he or she has an impairment, as well as how severe it is. An impairment must result from an anatomical, physiological, or psychological abnormality, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. In this case, as we said, there is substantial medical evidence in the record to support the decision. Mr. Duncan's three most recent visits with Dr. Bilby, who was his primary care physician, who was the one who started seeing him in 2004. He complained of no back pain, and his exams were normal. His MRI was normal. Dr. Schoedinger, who was the orthopedic surgeon who performed the back surgery, found that the fusion was solid and thought that Mr. Duncan was doing well. He sent him to physical therapy, and the physical therapy rehab notes say that his prospects were good with continued physical therapy. In addition, Dr. Schoedinger referred him to a functional capacity testing in 2006, and it showed that he had the capacity to do light work. I see that my time is up. Sure. Yes. I don't believe so. This all started back in 2004. He had a fall in a train yard in Indiana, and I believe that the settlement is related to that fall and negligence on the railroad part regarding that. He went back to work after that as a switchman, and then after he returned back to work is when he re-aggravated his back, and it was after that that he had the surgery. Thank you. Thank you. Just really briefly with respect to Dr. Oye, we don't know his specialty or his or her specialty. It's clear that Dr. Farrell was specialized in Duncan's condition, chronic pain syndrome. With respect to 20CFR-C, the fact that I disagree with the respondent, the ultimate RFC is a legal conclusion and up to the hearing officer, but the regulation states that the hearing officer must make every reasonable effort to obtain from the doctor any evidence that's necessary prior to generating an opinion. I think that regulation certainly comes into play here where it's not stated by Dr. Oye that the opinion was not supported by the record, just not complete, and we certainly don't know what not complete means. With respect to the credibility determination and the $200 for medical care, yes, the decision was 18 pages long. A lot of it's boilerplate. But if we look to Social Security law, for example, before holding against an individual the fact that they didn't proceed with certain treatment, they have to weigh into consideration the fact that an individual couldn't afford treatment, which is certainly relevant in this case. I don't think that there's any evidence in the opinion that the hearing officer took into consideration that Dr. Farrell considered whether an inflammatory process might be present. And with respect to the Step 4 and Step 5 determination that the respondent is speaking to, the line of questioning to the vocational expert, the vocational expert in particular stated that they were not clear from Dr. Farrell's assessment what sitting for very long meant, and if the vocational expert were to interpret that as sitting for longer than two hours at a time, then there would be sedentary work. But that July 2010 assessment makes clear that Duncan couldn't sit, stand, or walk for longer than 30 minutes at a time. So it's clear from both of those assessments that, per the vocational expert's testimony, there would be no work. Thank you. Well, I think both of you, the case will be taken under advisement. We're going to take a five-minute break.